## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON WORKERS DISTRICT COUNCIL OF NEW ENGLAND HEALTH AND WELFARE FUND, UTAH-IDAHO TEAMSTERS SECURITY FUND, JACKSONVILLE POLICE OFFICERS AND FIRE FIGHTERS HEALTH INSURANCE TRUST, and NYST COUNCIL HEALTH & HOSPITAL FUND, on behalf of themselves and others similarly situated,<br><br>           Plaintiffs<br><br>   v.<br><br>TEVA PHARMACEUTICAL INDUSTRIES LTD.; TEVA PHARMACEUTICALS USA, INC.; TEVA BRANDED PHARMACEUTICAL PRODUCTS R&D, INC.; and NORTON (WATERFORD) LTD.,<br><br>           Defendants. | Civ. No. 23-cv-11131 (NMG) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION
FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT
AND CERTIFICATION OF SETTLEMENT CLASS**

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     PROCEDURAL AND FACTUAL BACKGROUND ....................................................3

        A.  The End-Payor Plaintiffs allege Teve improperly delayed generic competition
            for beclomethasone dipropionate HFA inhalers........................................................3

        B.  The parties engage in substantial discovery.............................................................4

        C.  After extensive arm's length negotiations, End-Payer Plaintiffs and Teva
            Settle the case for $35 million and withdrawal of patents from the
            Orange Book ...............................................................................................................4

        D.  Settlement Terms and Plan of Allocation..................................................................5

III.    ARGUMENT......................................................................................................................6

        A.  The Proposed Settlement Meets the Standard for Preliminary Approval ...............6

            1.  The Class representatives and Class Counsel have adequately
                represented the class ..........................................................................................8

                a.  The End-Payor Plaintiffs vigorously represented the End-Payor
                    Class throughout two and a half years of litigation ....................................8

                b.  Class Counsel for the End-Payor Plaintiffs have adequately
                    represented the End-Payor Class, engaging in detailed investigation,
                    discovery, and motion practice ..................................................................8

            2.  The proposed settlement is the product of good faith, informed,
                arm's-length negotiations....................................................................................9

            3.  The relief provided for the class is adequate ...................................................11

                a.  The Settlement confers significant benefits on the End-Payor Class ........11

b.  End-Payor Plaintiffs faced significant risks in taking the action to trial, which would have been costly and caused considerable delay..................13

c.  The settlement provides for an effective method of distributing relief to the class........................................................................................16

d.  The attorneys' fees contemplated by the Settlement Agreement Are reasonable .........................................................................................17

e.  The only agreement required to be identified under Rule 23(e)(3) is a Routine agreement concerning opt-outs ..................................................17

4.  The proposed settlement treats class members equitably relative to each other through a fair, reasonable, and adequate Plan of Allocation ..........18

5.  The proposed form and manner of notice are appropriate ..............................19

6.  The Court should appoint A.B. Data as settlement administrator...................23

7.  The Court should appoint Western Alliance Bank as Escrow Agent..............23

8.  The proposed schedule is fair and should be approved ...................................23

B.  The End-Payor Class should be certified for settlement purposes .......................25

1.  Class certification is appropriate under Rule 23(a)..........................................26

a.  Class members are so numerous that joinder is impractical....................26

b.  The End-Payor Plaintiffs' claims present common issues of law and fact.......................................................................................................27

c.  The EPPs' claims are typical of those in the Class ..................................28

d.  End-Payor Plaintiffs will adequately represent the Class .........................30

2.  Rule 23(b)(3) is satisfied..................................................................................31

3.  The Class is ascertainable ................................................................................33

      4.   Proposed Class Counsel satisfy Rule 23(g) ......................................................35

IV.     CONCLUSION.............................................................................................................36

# TABLE OF AUHORITIES

Page(s)

Cases

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................................ 30, 32, 33

*Amgen, Inc., et.al. v. Connecticut Retirement Plans and Trust Funds*,
  568 U.S. 466 ...................................................................................................................... 32

*Andrews v. Bechtel Power Corp.*,
  780 F.2d 124 (1st Cir. 1985) ........................................................................................... 30

*Bezdek v. Vibram USA Inc.*,
  79 F. Supp. 3d 324 (D. Mass.) ........................................................................................ 14

*Bussie v. Allmerica Fin. Corp.*,
  50 F. Supp. 2d 59 (D. Mass. 1999) ............................................................................ 7, 15

*City P'ship Co. v. Atl. Acquisition Ltd. P'ship*,
  100 F.3d 1041 (1st Cir. 1996) ........................................................................................... 6

*Crosby v. Soc. Sec. Admin. of the U.S.*,
  796 F.2d 576 (1st Cir. 1986) ........................................................................................... 33

*Donovan v. Philip Morris USA, Inc.*,
  No. CIV.A. 06-12234-DJC, 2012 WL 957633 (D. Mass. Mar. 21, 2012) ................................ 26

*Fid. & Guar. Ins. Co. v. Star Equip. Corp.*,
  541 F.3d 1 (1st Cir. 2008) .................................................................................................. 6

*García-Rubiera v. Calderón*,
  570 F.3d 443 (1st Cir. 2009). ......................................................................................... 26

*Giusti-Bravo v. U.S. Veterans Admin.*,
  853 F. Supp. 34 (D.P.R. 1993) ........................................................................................ 14

*Hawaii v. Standard Oil Co.*,
  405 U.S. 251 (1972) ........................................................................................................ 25

*Hill v. State St. Corp.*,
  No. 09-12146, 2014 U.S. Dist. LEXIS 179702 (D. Mass. Nov. 26, 2014) ......................... 7, 17

*Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta Pharms., Inc.*,
  333 F.R.D. 390 (M.D. Tenn. 2019) ............................................................................. 27, 30

*In re Bank of Boston Corp. Sec. Litig.*,
    762 F. Supp. 1525 (D. Mass. 1991) ....................................................................... 28

*In re Carbon Black Antitrust Litig.*,
    No. 03-10191-DPW, 2005 WL 102966 (D. Mass. Jan. 18, 2005) ................................ 25, 28, 30

*In re Cardizem CD Antitrust Litig.*,
    200 F.R.D. 326 (E.D. Mich. 2001) ........................................................................ 30

*In re Cardizem CD Antitrust Litig.*,
    218 F.R.D. 508 (E.D.Mich. 2003) ......................................................................... 19

*In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*,
    315 F.R.D. 122 (D.Mass. 2016). ........................................................................... 27

*In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*,
    333 F.R.D. 364 (E.D. Pa. 2019). ........................................................................... 32

*In re Compact Disc Minimum Advertised Price Antitrust Litig.*,
    216 F.R.D. 197 (D. Me. 2003) .............................................................................. 19

*In re Credit Suisse-AOL Sec. Litig.*,
    253 F.R.D. 17 (D. Mass. 2008) ............................................................................. 28

*In re Evergreen Ultra Short Opportunities Fund Secs. Litig.*,
    275 F.R.D. 382 (D. Mass. 2011) ........................................................................... 28

*In re Flonase Antitrust Litig.*,
    284 F.R.D 207 (E.D. Pa. 2012) ........................................................................ 29, 31

*In re Glumetza Antitrust Litig.*,
    19-5822, 2022 U.S. Dist. LEXIS 20157 (N.D. Cal. Feb. 3, 2022) ............................... 15

*In re IMAX Secs. Litig.*,
    283 F.R.D. 178 (S.D.N.Y.  2012) .......................................................................... 17

*In re Imprelis Herbicide Mktg., Sales Pracs. & Prods. Liab. Litig.*,
    296 F.R.D. 351 (E.D. Pa. 2013) ............................................................................ 14

*In re Lantus Direct Purchaser Antitrust Litig.*,
    950 F.3d 1 (1st Cir. 2020) ................................................................................... 10

*In re Loestrin 24 FE Antitrust Litig.*,
    410 F. Supp. 3d 352 (D.R.I. 2019)................................................................ 26, 27, 29

*In re Loestrin 24 Fe Antitrust Litig.*,
    No. 13-2472, 2020 U.S. Dist. LEXIS 1257461 (D.R.I. July 17, 2020) ......................... 15

*In re Lucent Techs., Inc., Sec. Litig.*,
    307 F Supp. 2d 633 (D.N.J. 2004) ............................................................... 18

*In re Lupron Mktg. & Sales Pracs. Litig.*,
    345 F. Supp. 2d 135 (D. Mass. 2004) ............................................................ 7

*In re Lupron Mktg. & Sales Pracs. Litig.*,
    228 F.R.D. 75 (D. Mass. 2005) ................................................................ 6, 9

*In re M3 Power Razor Sys. Mktg. & Sales Prac. Litig.*,
    270 F.R.D. 45 (D. Mass. 2010) .................................................................... 7

*In re McKesson Governmental Entities Average Wholesale Price Litig.*,
    767 F. Supp. 2d 263 (D. Mass. 2011)...................................................... 26, 27

*In re Namenda Indirect Purchaser Antitrust Litig.*,
    338 F.R.D. 527 (S.D.N.Y. 2021) ................................................................ 32

*In re Nat'l Football League Players Concussion Injury Litig., In re Nat'l Football League
    Players Concussion Inj. Litig.*,
    821 F.3d 410 (3d Cir. 2016) ....................................................................... 31

*In re Nexium (Esomeprazole) Antitrust Litig.*,
    297 F.R.D. 168 (D. Mass. 2013) ................................................................ 31

*In re Playmobil Antitrust Litig.*,
    35 F. Supp. 2d 231 (E.D.N.Y. 1998) .......................................................... 29

*In re Relafen Antitrust Litig.*,
    218 F.R.D. 337 (D. Mass. 2003) ................................................................ 26

*In re Relafen Antitrust Litig.*,
    221 F.R.D. 260 (D.Mass. 2004) ................................................................. 30

*In re Relafen Antitrust Litig.*,
    231 F.R.D. 52 (D. Mass. 2005) ......................................................... 9, 18, 19

*In re Remeron End-Payor Antitrust Litig.*,
    2005 WL 2230314............................................................................... 22

*In re Remicade Antitrust Litig.*,
    No. 17-CV-04326, 2022 WL 3042766 (E.D. Pa. Aug. 2, 2022) ................................ 33

*In re Remicade Antitrust Litig.*,
    No. 17-CV-04326, 2023 WL 2530418 (E.D. Pa. Mar. 15, 2023) ............................. 22

*In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*,
    335 F.R.D. 1 (E.D.N.Y. 2020)................................................................... 27

vi

*In re Skechers Toning Shoe Prods. Liab. Litig.*,
  No. 11-MD-2308, 2012 U.S. Dist. LEXIS 113641 (W.D. Ky. Aug. 13, 2012) ........................ 9

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
  No. 14-02503, 2017 WL 4621777 (D. Mass. Oct. 16, 2017)............................................. passim

*In re Southeastern Milk Antitrust Litig.*,
  08-MD-1000, 2013 U.S. Dist. LEXIS 70167 (E.D. Tenn. May 17, 2013) .............................. 14

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
  421 F. Supp. 3d 12 (E.D. Pa. 2019) ................................................................ 27, 34

*In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*,
  967 F.3d 264 (3d Cir. 2020) .................................................................................. 27

*In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*,
  No. 13-MD-2445, 2023 WL 8437034 (E.D. Pa. Dec. 4, 2023) ................................... 16

*In re Thalomid & Revlimid Antitrust Litig*,
  No. CV 14-6997, 2018 WL 6573118 ...................................................................... 33

*In re Vitamins Antitrust Litig.*,
  209 F.R.D. 251 (D.D.C. 2002) .............................................................................. 28

*In re Warfarin Sodium Antitrust Litig.*,
  212 F.R.D. 231 (D. Del. 2002) .............................................................................. 28

*In re Warfarin Sodium Antitrust Litig.*,
  391 F.3d 516 .......................................................................................................... 32

*In re Zetia (Ezetimbe) Antitrust Litig.*,
  No. 2:18-MD-2836, 2022 WL 3337794 (E.D. Va. Feb. 9, 2022) ............................... 22

*John Joseph Mc Gee v. Nold (HK) Ltd.*,
  2024 WL 15085 (N.D.Cal. Jan. 11, 2024) ............................................................. 15

*Karth v. Keryx Biopharmaceuticals, Inc.*,
  334 F.R.D. 7 (D. Mass. 2019) ............................................................................... 33

*Kinney v. Metro Glob. Media, Inc.*,
  No. 99-CV-579, 2002 WL 31015604 (D.R.I. Aug. 22, 2002)................................... 28

*Lessard v. Metro. Life Ins. Co.*,
  103 F.R.D. 608 (D. Me. 1984) .............................................................................. 25

*Matamoros v. Starbucks Corp.*,
  699 F.3d 129 (1st Cir. 2012) .......................................................................... 30, 33

*Mullane v. Cent. Hanover Bank & Trust Co.*,
   339 U.S. 306 (1950) ........................................................................................ 20

*Natchitoches Parish Hospital Service District, et.al.*,
   247 F.R.D. 253 (D. Mass. 2008) ..................................................................... 30

*Nat'l Ass'n of Chain Drug Stores v. New England Carptenters Health Benefits Fund*,
   582 F.3d 30 (1st Cir. 2009) ............................................................................... 9

*New England Biolabs, Inc. v. Miller*,
   No. 1:20-CV-11234-RGS, 2022 WL 20583575 (D. Mass. Oct. 26, 2022) ............ 6, 9

*New England Carpenters Health Benefits Fund v. First DataBank, Inc.*,
   602 F. Supp. 2d 277 (D. Mass. 2009) .............................................................. 9

*New England Carpenters Health Benefits, et.al. v. First Databank, Inc., et.al.*
   2009 WL 10703302 (D. Mass. Mar. 30, 2009) ................................................ 9

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001) ............................................................................ 28

*Nichols v. SmithKline Beecham Corp., No.*
   No. CIV.A.00, 0-6222, 2005 WL 950616 (E.D. Pa. April 22, 2005) .......... 13, 18, 19

*Osgood v. Harrah's Entm't., Inc.*,
   202 F.R.D. 115 (D.N.J. 2001) ......................................................................... 28

*Rolland v. Cellucci*,
   191 F.R.D. 3 (D. Mass. 2000) ......................................................................... 14

*Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
   No. CIV.A. 04-5898, 2010 WL 3855552 (E.D. Pa. Sept. 30, 2010) ................. 28

*Smilow v. Southwestern Bell Mobile Systems, Inc.*,
   323 F.3d 32 (1st Cir. 2003) ............................................................................. 25

*Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of New York, LLC*,
   124 F.4th 898 (Fed. Cir. 2024) ...................................................................... 10

*Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of New York, LLC*,
   736 F.Supp.3d 227 (D.N.J. 2024) ........................................................ 10, 11, 12, 13

*Teva Branded Pharm. Prods. R&D, Inc. v. Cipla Ltd.*,
   678 F.Supp.3d 559 (D.N.J. 2023) .................................................................. 13

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011) ........................................................................................ 26

Rules

Fed. R. Civ. P. 23 ................................................................................................................ passim

Fed. R. Civ. P. 23(a) .................................................................................................................. 3, 25

Fed. R. Civ. P. 23(a)(1) .................................................................................................................. 25

Fed. R. Civ. P. 23(a)(2) .................................................................................................................. 26

Fed. R. Civ. P. 23(a)(3) .................................................................................................................. 28

Fed. R. Civ. P. 23(a)(4) .............................................................................................................. 29, 35

Fed. R. Civ. P. 23(b) .................................................................................................................... 25

Fed. R. Civ. P. 23(b)(3) .................................................................................................... 3, 31, 32, 33

Fed. R. Civ. P. 23(c)(2) .................................................................................................................. 20

Fed. R. Civ. P. 23(c)(2)(B) .............................................................................................................. 20

Fed. R. Civ. P. 23(e) ................................................................................................................ passim

Fed. R. Civ. P. 23(e)(1)(A) ............................................................................................................... 6

Fed. R. Civ. P. 23(e)(1)(B) ........................................................................................................... 7, 19

Fed. R. Civ. P. 23(e)(1)(B)(ii) ......................................................................................................... 24

Fed. R. Civ. P. 23(e)(2) .................................................................................................................... 7

Fed. R. Civ. P. 23(e)(2)(C) .............................................................................................................. 11

Fed. R. Civ. P. 23(e)(3) .................................................................................................................. 17

Fed. R. Civ. P. 23(g) ............................................................................................................. 3, 35, 36

Fed. R. Civ. P. 23(g)(1)(A) .............................................................................................................. 35

Regulations

21 C.F.R. § 314.53(f)(2) ................................................................................................................... 1

Other Authorities

Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure,*
7A § 1788 (3d ed., 1986) ............................................................................................. 31

*Manual for Complex Litigation*, Fourth § 21.632 (4th ed. 2004) .................................................. 6

Herbert B. Newberg, Alba Conte & William B. Rubenstein, *Newberg on Class
Actions* § 3:58 (5th ed. 2012).......................................................................................... 30

William B. Rubenstein et al. *Newberg on Class
Actions* § 13:10 (5th ed. 2013) ........................................................................................ 6

William B. Rubenstein, *Newberg on Class
Actions* § 20:40 (5th ed., Dec. 2019 update)..................................................................... 29

## I.    INTRODUCTION

Plaintiffs Iron Workers District Council of New England Health and Welfare Fund, Utah-Idaho Teamsters Security Fund, Jacksonville Police Officers and Fire Fighters Health Insurance Trust, and NYST Council Health & Hospital Fund (collectively, the "End-Payor Plaintiffs" or "EPPs"), individually and on behalf of the putative class of end payors they seek to represent (collectively, the "End-Payor Class" or "Class"), have entered into a proposed settlement in this class action with defendants Teva Pharmaceutical Industries Ltd.; Teva Pharmaceuticals USA, Inc.; Teva Branded Pharmaceutical Products R&D LLC; and Norton (Waterford) Ltd. (collectively, "Teva" or the "Defendants" and, together with Plaintiffs, the "Parties").

The End-Payor Plaintiffs brought this class action against Defendants two and a half years ago, alleging that they engaged in an anticompetitive scheme to prevent and/or delay the approval and marketing of generic versions of QVAR (beclomethasone dipropionate HFA) prescription asthma inhalers. The scheme included, *inter alia*, improper patent listings in the FDA's list of Approved Drug Products with Therapeutic Equivalence Evaluations (the "Orange Book") and product hops.  The EPPs allege that Defendants' scheme violated certain federal and state antitrust, consumer protection, and/or unjust enrichment laws, and caused End-Payors (i.e., consumers and third-party payors like health and welfare benefit plans) to pay supracompetitive prices for beclomethasone dipropionate HFA inhalers.

The proposed settlement provides (1) for $35 million in cash to be distributed to the End-Payor Class, and (2) that Teva request that all patents currently listed for QVAR be delisted from the Orange Book, pursuant to 21 C.F.R. § 314.53(f)(2).  In exchange, the settlement provides for

the dismissal of this action with prejudice and the provision of releases from the End-Payor Class, as set forth in the Settlement Agreement.[1]

The proposed settlement represents an excellent result for the End-Payor Class.  In particular, the injunctive relief included in the settlement—Teva's withdrawal of all QVAR patents from the Orange Book that Defendants allegedly listed to impede generic entry—is what End-Payor Plaintiffs sought to achieve in this action at trial.  The cash component will further directly benefit the End-Payor Class to offset past alleged overcharges suffered by Class members due to Teva's alleged misconduct.

End-Payor Plaintiffs, on behalf of themselves and the End-Payor Class, respectfully request—and Teva does not oppose—that the Court preliminarily approve the proposed settlement, including its plan of allocation, form and manner of notice, settlement administrator, and escrow agent.  Proposed co-lead counsel for the Class—Berman Tabacco, Sperling Kenny Nachwalter, LLC, and Hilliard Shadowen LLP (together, "Class Counsel")—submit that the proposed settlement is fair, reasonable, and adequate, and represents an excellent result for the Class.  The settlement was negotiated in good faith and at arm's length by counsel experienced in pharmaceutical antitrust matters following more than two and a half years of hard-fought litigation.  And given that Teva denies EPP Plaintiffs' allegations of unlawful conduct and maintains it has meritorious defenses to this litigation, the settlement ensures that the End-Payor Class will receive substantial benefits while avoiding the risks and delays of continued litigation.

To effectuate this settlement, End-Payor Plaintiffs, individually and on behalf of the Class, request that the Court conditionally certify the proposed End-Payor Class for settlement

---

[1]  The Settlement Agreement is attached as Exhibit A to the Declaration of Todd A. Seaver ("Seaver Decl."), submitted herewith.

purposes pursuant to Fed. R. Civ. P. 23(e).  The requirements of Rule 23(a), 23(b)(3) and 23(g) are all satisfied here, and certification of a settlement class is thus appropriate.

## II.    PROCEDURAL AND FACTUAL BACKGROUND

### A.  The End-Payor Plaintiffs allege Teva improperly delayed generic competition for beclomethasone dipropionate HFA inhalers.

End-Payor Plaintiffs filed their initial complaint against Teva on May 19, 2023, and the action was assigned to the Hon. Nathaniel M. Gorton on July 21. 2023.  ECF Nos. 1, 30.  EPPs then filed an amended class action complaint ("CAC") on September 1, 2023.  ECF No. 31.

The CAC alleges that Teva engaged in a multifaceted anticompetitive scheme designed to prevent and/or delay the approval and marketing of generic versions of QVAR, an inhaler device containing the asthma medication beclomethasone dipropionate HFA.  The CAC alleges, amongst other things, that Teva (i) engaged in improper product hops, (ii) wrongfully listed patents in the Orange Book, (iii) engaged in serial sham litigations, and (iv) entered into a reverse payment agreement to prevent and/or delay multiple generic companies from timely entering the market with less expensive versions of beclomethasone dipropionate HFA inhalers.

End-Payor Plaintiffs brought claims for damages from violations of various state antitrust and consumer protection laws, for equitable relief under state unjust enrichment law, and for injunctive relief under federal antitrust law.  CAC ¶¶ 616-701.

Defendants moved to dismiss the CAC on October 18, 2023.  ECF Nos. 38-39.  After the motion was fully briefed, on May 7, 2024, the Court allowed Defendants' motion in part and denied it in part.  ECF No. 49.  The Court dismissed the sham litigation claims and certain state law claims but allowed the rest to move forward into discovery.

On June 18, 2024, Defendants simultaneously answered the CAC, moved for judgment on the pleadings, and moved for a stay pending resolution of that motion.  ECF Nos. 62-67.  The

Court denied Defendants' Motion to Stay at a June 25, 2024 scheduling conference, and the parties proceeded to brief the Motion for Judgment on the Pleadings.  ECF Nos. 72, 96, 105.  On November 6, 2024, the Court granted Defendants' Motion for Judgment on the Pleadings with respect to the reverse payment claims but otherwise denied the motion.  ECF No. 133.

### B.  The parties engage in substantial discovery.

The Parties engaged in significant discovery in this case, including the production and review of millions of pages of documents, subpoenas to third parties, and exhaustive consultations with experts.  Seaver Decl. ¶ 4.  At the time of settlement, fact discovery was scheduled to be completed by September 30, 2025, followed by formal expert discovery and a fixed trial date in September 2026.  ECF No. 185.

### C.  After extensive arm's length negotiations, End-Payor Plaintiffs and Teva settle the case for $35 million and withdrawal of patents from the Orange Book.

After extensive negotiations lasting several months, Teva and the End-Payor Plaintiffs reached a settlement involving payment of $35 million and withdrawal of all patents currently listed for QVAR from the Orange Book, subject to this Court's approval.  Negotiations to resolve the case began in the middle of March 2025 when Class Counsel reached out to Teva's counsel to initiate discussions.  Seaver Decl. ¶ 6.  In doing so, Class Counsel ensured it had a substantial understanding of the factual record and the strengths and weaknesses of EPP Plaintiffs' claims.  *Id.*

Negotiations between counsel for the Parties resulted in a settlement in principle reached in early August 2025.  *Id.* ¶ 9.  During that five-month period, the Parties exchanged information and their sharply divergent views of the case, but they were able to negotiate both a cash settlement and a commitment from Teva to withdraw all currently listed patents for QVAR from the Orange Book.  *Id.* ¶ 8.  Teva's commitment to withdraw the patents identified in the

Settlement Agreement means that QVAR 40 (NDA No. 20911) and QVAR 80 (NDA No. 20911)

will have no remaining patents listed in the Orange Book upon final approval of the Settlement.

*Id.* With respect to QVAR Redihaler (0.04mg), NDA No. 207921, and QVAR Redihaler

(0.08mg), NDA No. 207921, the only remaining patent listings will be those that claim either

beclomethasone dipropionate or beclomethasone. *Id.* The settlement was initially embodied in a

Binding Memorandum of Understanding dated August 1, 2025, and subsequently, after

additional negotiation, a formal Settlement Agreement executed September 25, 2025. *Id.* ¶ 9 &

Ex. A.

As such, the negotiations were at arm's length, vigorous, and, at times, contentious. It is

the considered view of End-Payor Plaintiffs' counsel that the resulting Settlement represents a

excellent result for the End-Payor Class and a fair and reasonable compromise of the claims

against Teva that achieves important concessions concerning the withdrawal of patent listings.

*Id.* ¶ 9.

### D. Settlement Terms and Plan of Allocation

The proposed settlement provides for (1) payment by Teva of $35 million into an interest-

bearing escrow account in four installments, and (2) Teva's commitment to withdraw all six

patents currently listed for QVAR from the FDA's Orange Book. Settlement Agr. ¶ 7. In

exchange for the cash payment and withdrawal, the End-Payor Plaintiffs and End-Payor Class

will dismiss their claims against Teva with prejudice and, consistent with the terms of the

Settlement Agreement, release all claims that they asserted or could have asserted in this action

relating to the conduct alleged. *Id.* ¶ 12.

The Plan of Allocation, discussed more fully below, provides for allocating 20.7% of the

Net Settlement Fund to consumer claimants and 79.3% of the Net Settlement Fund to third-party

payor claimants, based on the relative purchases of QVAR products by these groups.  *See* Seaver Decl. Ex. B (Plan of Allocation).  From these allocated funds, authorized claimants will receive their *pro rata* share of the Net Settlement Funds.  There is no provision in the Settlement for any reverter to Teva in connection with any unclaimed or residual funds.

## III.   ARGUMENT

### A.  The Proposed Settlement Meets the Standard for Preliminary Approval.

"Settlement agreements enjoy great favor with the courts as a preferred alternative to costly, time-consuming litigation."  *Fid. & Guar. Ins. Co. v. Star Equip. Corp.*, 541 F.3d 1, 5 (1st Cir. 2008) (internal quotations and citations omitted).[2]

Approval of a class action settlement under Rule 23(e) involves a two-step process. First, counsel submits the proposed terms of settlement, and the court makes a preliminary fairness evaluation.  *See Manual for Complex Litigation, Fourth* § 21.632 (4th ed. 2004).   The purpose of the preliminary approval process is to "provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class."  Fed. R. Civ. P. 23(e)(1)(A); *see New England Biolabs, Inc. v. Miller*, No. 1:20-CV-11234-RGS, 2022 WL 20583575, at *2 (D. Mass. Oct. 26, 2022) ("The purpose of preliminary approval is to determine 'whether to direct notice of the proposed settlement to the class, invite the class's reaction, and schedule a fairness hearing.'" (quoting William B. Rubenstein et al., Newberg on Class Actions § 13:10 (5th ed. 2013)).  In the second step, the court determines whether to grant final approval of the settlement after notice has been provided to settlement class members and the court holds

---

[2]  *Accord In re Lupron Mktg. & Sales Pracs. Litig.*, 228 F.R.D. 75, 88 (D. Mass. 2005) ("[T]he law favors class action settlements." (citing *City P'ship Co. v. Atl. Acquisition Ltd. P'ship*, 100 F.3d 1041, 1043 (1st Cir. 1996))).

a Fairness Hearing.  *See, e.g.*, *In re M3 Power Razor Sys. Mktg. & Sales Pracs. Litig.*, 270 F.R.D. 45, 62 (D. Mass. 2010) (citing *Manual for Complex Litigation*, *supra*, § 21.632).

To obtain preliminary approval, the parties must make a showing "that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal."  Fed. R. Civ. P. 23(e)(1)(B).  Thus, the parties must show that the court will likely be able to find that the settlement is fair, reasonable, and adequate upon considering whether "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate…; and (D) the proposal treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2).  In the First Circuit, courts look to four factors to determine whether a settlement is entitled to a presumption of fairness: "(1) the negotiations occurred at arm's length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected."  *In re Lupron Mktg. & Sales Pracs. Litig.*, 345 F. Supp. 2d 135, 137 (D. Mass. 2004).[3]

Preliminary approval does not require a hearing (though Class Counsel will make themselves available should the Court desire one at this stage).  As explained in the Manual for Complex Litigation (Fourth), "this initial evaluation can be made on the basis of information already known, supplemented as necessary by briefs, motions, or informal presentations by parties."[4]  Given the Court's familiarity with the case and counsel, supplemented by the

---

[3]  The fourth factor is more often relevant for purposes of final approval, after notice has issued and class members have been given an opportunity to object to a settlement. *Id.*; *see also Hill v. State St. Corp.*, No. 09-12146, 2014 U.S. Dist. LEXIS 179702, at *21 (D. Mass. Nov. 26, 2014) ("The 'favorable reaction of class to settlement, albeit not dispositive, constitutes strong evidence of fairness of proposed settlement and supports judicial approval[.]'" (quoting *Bussie v. Allmerica Fin. Corp.*, 50 F. Supp. 2d 59, 77 (D. Mass. 1999)) (alteration in original)).

[4]  *Manual for Complex Litigation*, *supra*, § 21.632 at 382.

pleadings and exhibits submitted herewith, this Court can and should grant the End-Payor

Plaintiffs' unopposed motion and preliminarily approve the settlement.

1. **The Class representatives and Class Counsel have adequately represented the class.**

a. **The End-Payor Plaintiffs vigorously represented the End-Payor Class throughout two and a half years of litigation.**

All four EPP Plaintiffs are union health and welfare plans that provide health benefits to

their union members and their families.  They each voluntarily stepped forward and brought this

action to challenge Teva's allegedly unlawful conduct with the aim of removing impediments to

entry of generic QVAR and promoting lower drug prices for these asthma inhalers.  The End-

Payor Plaintiffs engaged fully in discovery, making initial disclosures, responding to 65 requests

for production of documents, identifying custodians, negotiating and running search terms,

collecting documents, and responding to interrogatories.  Seaver Decl. ¶ 5.  At the time of

settlement, the EPPs were gearing up to provide deposition testimony in response to Teva's

30(b)(6) deposition notice identifying 68 topics for testimony.  *Id.*  EPPs devoted substantial time

and effort working with their counsel to prosecute this action, including undertaking significant

efforts to respond to Defendants' discovery requests and review court filings to ensure the Class

was well-represented.

b. **Class Counsel for the End-Payor Plaintiffs have adequately represented the End-Payor Class, engaging in detailed investigation, discovery, and motion practice.**

Class Counsel have vigorously prosecuted this action for two and a half years, the

settlement was reached at a reasonably mature stage of the case.  The Parties engaged in two

rounds of briefing at the pleadings phase, on which this Court ruled and issued opinions.  Seaver

Decl. ¶ 3.  Thereafter, the Parties engaged in discovery for approximately a year, including the exchange of written discovery; document production and review, including Defendants' production of more than 460,000 documents totaling about 4.6 million pages; third-party discovery that included the production of about 825,000 more pages; and preparation for numerous depositions.  *Id.* ¶ 4.  The Parties also consulted extensively with economic, scientific, patent, and regulatory experts, in preparation for the submission of expert reports and formal expert discovery.  *Id.*  Thus, issues relating to liability, causation, and damages were well-developed, enabling Class Counsel to make an informed decision regarding the strengths and weaknesses of the case and the merits of the proposed settlement.

>   **2.    The proposed settlement is the product of good faith, informed, arm's-length negotiations.**

Negotiation leading to settlement is a key factor in deciding whether to grant preliminary approval.  "A settlement is presumed to be reasonable when it is achieved by arm's length negotiations conducted by experienced counsel."  *New England Biolabs, Inc. v. Miller*, No. 1:20-CV-11234-RGS, 2022 WL 20583575, at *3 (D. Mass. Oct. 26, 2022).[5]  Non-collusive, arm's length negotiations such as those that took place here guard against any "obvious deficiencies" in a settlement.  *In re Skechers Toning Shoe Prods. Liab. Litig.*, No. 11-MD-2308, 2012 U.S. Dist. LEXIS 113641, at *21 (W.D. Ky. Aug. 13, 2012).

As recounted above, counsel for the End-Payor Plaintiffs and counsel for Teva engaged in five months of arm's-length, hard-fought settlement negotiations.  These negotiations were

---

[5]  *See also In re Lupron Mktg. & Sales Pracs. Litig.,* 228 F.R.D. at 93; *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 76-77 (D. Mass. 2005); *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, 602 F. Supp. 2d 277, 282 (D. Mass.), *judgment entered,* No. CV 05-11148-PBS, 2009 WL 10703302 (D. Mass. Mar. 30, 2009), and *aff'd sub nom. Nat'l Ass'n of Chain Drug Stores v. New England Carptenters Health Benefits Fund*, 582 F.3d 30 (1st Cir. 2009).

based upon the extensive record in this case, including briefing and rulings on both a motion to dismiss and a motion for judgment on the pleadings, review of millions of pages of documents produced, exhaustive consultations with experts, and Class Counsel's extensive experience in prosecuting delayed generic entry cases.

Further informing the settlement discussions was recent and further development of the case law articulating when it is appropriate, and not appropriate, for patents to be listed in the FDA's Orange Book.  In particular, in December 2024, the Federal Circuit affirmed a district court opinion that ordered some of the same patent listings at issue in this case to be stricken from the Orange Book.  *Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of New York, LLC*, 124 F.4th 898 (Fed. Cir. 2024) (affirming *Teva Branded Pharm. Prods. R&D, Inc. v. Amneal Pharms. of New York, LLC*, 736 F.Supp.3d 227 (D.N.J. 2024) ("*Teva v. Amneal*").   As the Federal Circuit held, "to qualify for listing [in the Orange Book], a patent must claim at least what made the product approvable as a drug in the first place – its active ingredient.  In other words, Teva cannot list its patents just because they claim the dose-counter and canister parts…." *Id*. at 911; *see also id*. at 916 ("a patent 'claims the drug for which the applicant submitted the [NDA]' … when it particularly points out and distinctly claims the drug – not simply when the claim could somehow be interpreted to read on the drug.") (citation omitted).  The Federal Circuit's holding is consistent with the First Circuit's holding in *Lantus* that, if "the claims of [a] patent [in the Orange Book] do not mention the drug for which the [related NDA] was submitted, the patent does not 'claim the drug,' and it was improper for [the manufacturer] to have submitted it for listing in the Orange Book."  *In re Lantus Direct Purchaser Antitrust Litig.*, 950 F.3d 1, 8 (1ˢᵗ Cir. 2020).

As End-Payor Plaintiffs contended here, the patents Teva listed in the Orange Book for

QVAR do not mention the drug beclomethasone dipropionate or, accordingly, a beclomethasone dipropionate drug product—in the patents' claims or elsewhere; and other patents Teva listed in the Book for QVAR Redihaler likewise do not include beclomethasone dipropionate or a beclomethasone dipropionate drug product in their claims.  End-Payor Plaintiffs accordingly maintained, consistent with the appellate holdings in *Teva v. Amneal* and *Lantus*, that these patents did not belong in the Orange Book.  This position and the underlying caselaw informed the Parties' settlement negotiations.

### 3.    The relief provided for the class is adequate.

In determining whether the relief provided by the settlement is adequate, the Court considers "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)."  Fed. R. Civ. P. 23(e)(2)(C).  In deciding whether a settlement deserves preliminary approval, "[a] basic focus is the extent and type of benefits that the settlement will confer on the members of the class. …The parties should also supply the court with information about the likely range of litigated outcomes, and about the risks that might attend full litigation."  Advisory Committee Comments to 2018 Amendments.  All of these factors weigh heavily in support of preliminary approval of the settlement.

### a.  The Settlement confers significant benefits on the End-Payor Class.

First, the significance of the injunctive relief provided for in the settlement cannot be overstated.  A key thrust of this litigation was to remove the regulatory barriers to generic entry erected by Teva's allegedly unlawful listing of various patents in the Orange Book for QVAR.  Requiring Teva to withdraw these patents as a part of the settlement means that End-Payor

Plaintiffs all or nearly all of the injunctive relief they would have been able to achieve if they prevailed at trial. It also means that all currently listed patents for QVAR 40 (NDA No. 20911) and QVAR 80 (NDA No. 20911) will be withdrawn, thereby eliminating regulatory barriers to generic competition, which further benefits the Class. And the only patent listings for QVAR Redihaler (0.04mg), NDA No. 207921, and QVAR Redihaler (0.08mg), NDA No. 207921, will be those that properly claim either beclomethasone dipropionate or beclomethasone, similarly facilitating generic entry to the inhaler market.

This relief is especially significant given that efforts by the Federal Trade Commission ("FTC") requesting that Teva withdraw these same patents were unsuccessful. End-Payor Plaintiffs here have achieved what the FTC did not.

Teva's withdrawal of patents in this Settlement also goes beyond the scope of patents the *Teva v. Amneal* court ordered delisted. While some of those patents are at issue in this action, none are included in the Settlement, which requires withdrawal of six *additional* patents that were not subject to the *Teva v. Amneal* delisting order.

Second, the $35 million cash component provides a direct monetary benefit to the End-Payor Class that is an excellent result for the Class in light of the risks faced by End-Payor Plaintiffs and the potential litigated outcome should the case have gone to trial. Class Counsel's economics expert, Dr. Keith Leffler, estimated reasonable single damages of approximately $308.5 million based on the assumption that three generics versions of QVAR would have entered the market in 2019 absent the alleged unlawful conduct. Seaver Decl. Ex. C (Leffler Decl.) ¶¶ 5, 10. The damages time period used by Dr. Leffler reflects the legitimate challenges End-Payor Plaintiffs faced in proving damages prior to 2019 due to statute of limitations concerns. The $35 million cash payment achieved by End-Payor Plaintiffs here amounts to

approximately 11.3% of estimated damages, which is in line with other complex pharmaceutical cases. *See, e.g., Nichols v. SmithKline Beecham Corp.*, No. CIV.A.00-6222, 2005 WL 950616, at *16 (E.D. Pa. Apr. 22, 2005) (approving settlement that amounted to "between 9.3% and 13.9% of damages" and noting that this percentage "is consistent with those approved in other complex class action cases"). The Settlement amount here compares favorably to the potential damages especially when considering the significant risks faced by End-Payor Plaintiffs (as described immediately below) and the fact that damages would be lower if fewer generics entered the market, or generics entered the market at a later entry date—both scenarios that were credible potential litigated outcomes.

### b. End-Payor Plaintiffs faced significant risks in taking the action to trial, which would have been costly and caused considerable delay.

Although Class Counsel have always been (and remain) confident in the strength of the End-Payor Plaintiffs' claims, there was no guarantee that a jury would have found in their favor. Given the risk of no, or a substantially reduced, monetary recovery, along with the risk of no equitable relief—risks that would persist even after a lengthy and costly trial—the relief obtained through the Settlement is substantial, and well within the range of possible approval.

In particular, were End-Payor Plaintiffs to proceed with their claims through trial, they would have faced significant challenges related to the elements of causation, relevant market, and market power. As evident from its motion for judgment on the pleadings, Teva vigorously contends that EPPs cannot show that the allegedly unlawful Orange Book listings prevented generic QVAR from coming to market in a but-for world. Teva contends that it has valid patents that lawfully prevent generic competitors from developing and selling generic QVAR inhalers, whether listed in the Orange Book or not. Indeed, Teva prevailed at trial against generic drugmaker Cipla, where the court found that Cipla's proposed generic QVAR inhaler infringed

certain of Teva's patents at issue in this action.  *See Teva Branded Pharm. Prods. R&D, Inc. v. Cipla Ltd.*, 678 F.Supp.3d 559 (D.N.J. 2023).

Teva also contends that the relevant market is far more expansive than beclomethasone dipropionate and extends to all inhaled corticosteroid maintenance inhaler products because, Teva asserts, asthma patients routinely switch to corticosteroid maintenance inhaler products.

These risks posed significant hurdles for End-Payor Plaintiffs in proceeding with their claims to trial.

In addition, proceeding to trial would have come with substantial costs and delay.  At the time the settlement was reached, the Parties were gearing up to take a host of depositions.  Soon after discovery closed, the Parties were scheduled to engage in expert discovery, which is extensive in pharmaceutical antitrust cases such as this one.  Thereafter, the Parties would have engaged in highly contested class certification and summary judgment motion practice, followed by trial and potential appeals.  At every stage of this process, End-Payor Plaintiffs ran the risk that their claims would not succeed.  Through this proposed Settlement, however, the End-Payor Class will receive the immediate benefit—now, instead of well in the future—of significant and certain cash recovery and the delisting of the QVAR patents.

Class Counsel, experienced in these types of cases and aware of these risks, believe the proposed Settlement is fair, reasonable, and adequate.  Courts often give significant weight when evaluating the reasonableness of a proposed class action settlement to the judgment of experienced counsel.  *See, e.g.*, *Rolland v. Cellucci*, 191 F.R.D. 3, 10 (D. Mass. 2000) ("When the parties' attorneys are experienced and knowledgeable about the facts and claims, their representations to the court that the settlement provides class relief which is fair, reasonable and

14

adequate should be given significant weight.").[6]  Even more so where, as here, Class Counsel investigated the facts and initiated the litigation, and then oversaw every aspect of the case going forward, including significant discovery and motion practice, so as to fully appreciate the pros and cons of proceeding with litigation.  *See, e.g.*, *Giusti-Bravo v. U.S. Veterans Admin.*, 853 F. Supp. 34, 40 (D.P.R. 1993) (weight of counsel's recommendation depends on "a variety of factors, among them the length of their involvement in the litigation, their competence, and their experience in this particular type of litigation.").

Indeed, in approving class action settlements, courts have repeatedly and explicitly deferred to the judgment of experienced counsel who have engaged in arm's-length negotiations. *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 348 (D. Mass.), *aff'd,* 809 F.3d 78 (1st Cir. 2015) (finding that the parties had a sufficient understanding of the merits of the case to engage in informed negotiations, "particularly where plaintiffs' counsel are skilled and experienced in consumer class action litigation, including class actions involving alleged misrepresentation of the health benefits of footwear").[7]  The presumption in favor of such settlements reflects the understanding that vigorous, skilled negotiation protects against collusion and advances the fairness interests of Rule 23(e).

Class Counsel have a great deal of experience in pharmaceutical antitrust litigation

---

[6] *Accord In re Imprelis Herbicide Mktg., Sales Pracs. & Prods. Liab. Litig.*, 296 F.R.D. 351, 364 (E.D. Pa. 2013); *In re Southeastern Milk Antitrust Litig.*, No. 08-md-1000, 2013 U.S. Dist. LEXIS 70167, at *21-22 (E.D. Tenn. May 17, 2013).

[7] *See also Bussie*, 50 F. Supp. 2d at 77 ("The Court's fairness determination also reflects the weight it has placed on the judgment of the parties' respective counsel, who are experienced attorneys and have represented to the Court that they believe the settlement provides to the Class relief that is fair, reasonable and adequate.").

generally and delayed generic entry cases in particular.[8]   This experience should be given weight in making a determination of preliminary approval.  Courts have recognized Class Counsel's expertise in this field and have repeatedly adjudged Class Counsel adequate under Rule 23(a)(4) and 23(g).[9]  Class Counsel have demonstrated throughout this litigation that they understand this area of antitrust law and have prosecuted this case with vigor and commitment. In light of Class Counsel's appraisal of the strengths and weaknesses of the End-Payor Plaintiffs' claims, the damages claimed in this action, the important injunctive relief and cash recovery achieved, and counsel's experience in other pharmaceutical antitrust cases, counsel believe this to be an excellent result for the Class that should be approved.

### c. The settlement provides for an effective method of distributing relief to the class.

As described more fully below in Sections 4 through 6, the cash component of the settlement will be effectively distributed to the Class via a fair and equitable Plan of Allocation, an appropriate Notice Plan through direct mail as well as digital and print media publication, and a straightforward claims process employing Claim Forms tailored to consumers and Third-Party

---

[8]  The firm resumes of Lead Counsel are attached as Exhibits H, I, J and K to the Seaver Declaration.

[9]  *See, e.g., In re Glumetza Antitrust Litig.*, No. 19-5822, 2022 U.S. Dist. LEXIS 20157, at *38 (N.D. Cal. Feb. 3, 2022) (noting "counsel [including Sperling and Hilliard Shadowen] provided strong representation for the class"); *In re Google Play Antitrust Litig.*, 2024 WL 15085 at *3 (N.D.Cal. Jan. 11, 2024) ("Class Counsel [including Sperling] obtained monetary relief and structural reforms for the Settlement Class, as to which the class members had no objections…."); *In re Loestrin 24 Fe Antitrust Litig.*, No. 13-md-2472, 2020 U.S. Dist. LEXIS 125746, at *48 (D.R.I. July 17, 2020) (finding counsel, including co-lead Hilliard Shadowen, "have demonstrated that they are skillful and well-experienced and that they have effectively and efficiently prosecuted this complex and protracted litigation to the benefit of the" class); *In re Aggrenox Antitrust Litig.*, No. 14-md-2516 (D. Conn. Mar. 6, 2018), ECF No. 766 (appointing Hilliard Shadowen as co-lead counsel); *Staley v. Gilead Sciences, Inc.*, No. 19-2573 (N.D. Cal. Sep. 9, 2019), ECF No. 163 (appointing Hilliard Shadowen as interim co-lead counsel).

Payors.

### d. The attorneys' fees contemplated by the Settlement Agreement are reasonable.

Rule 23(e)(2)(C)(iii) addresses "the terms of any proposed award of attorney's fees, including timing of payment." This factor recognizes that "[e]xamination of the attorney-fee provisions may also be valuable in assessing the fairness of the proposed settlement."[10] The Settlement Agreement (¶ 11) provides that End-Payor Plaintiffs' Counsel may petition for attorneys' fees of up to 33 percent of the Settlement Fund, plus the reimbursement of reasonable costs and expenses incurred in the prosecution of this action; all fees and expenses allowed by the Court would be paid from the Settlement Fund, leaving the Net Settlement Fund for distribution to the Settlement Class. Such fee petition will, of course, address the requested attorneys' fees under the appropriate factors. For present purposes, though a 33 percent fee award is within the range of amounts typically approved as reasonable. *See, e.g.*, *In re Solodyn Antitrust Litig.*, 1:14-MD-02503 (D. Mass.) (awarding one-third fee on settlement of $40 million); *In re Suboxone (Buprenorphine Hydrochloride and Naloxone) Antitrust Litig.*, No. 13-MD-2445, 2023 WL 8437034, at *20 (E.D. Pa. Dec. 4, 2023) (awarding fee of 33-1/3 percent of the settlement fund plus interest).

### e. The only agreement required to be identified under Rule 23(e)(3) is a routine agreement concerning opt-outs.

In addition to the Settlement Agreement, there is a Confidential Supplement, referenced in paragraph 17 of the Settlement Agreement, relating to the percentage of opt-outs necessary to trigger Teva's right to terminate the Settlement. This Supplement will be provided to the Court, *in camera*, upon request, and is of the type that is routinely utilized in class settlements of this

---

[10] Fed. R. Civ. P. 23, Advisory Committee Notes to December 1, 2018 Amendments.

nature. Other than that, the Settlement Agreement is the only agreement concerning the subject matter of this lawsuit or settlement.

        **4.**     **The proposed settlement treats class members equitably relative to each other through a fair, reasonable, and adequate Plan of Allocation.**

"A plan for allocating settlement proceeds, like the settlement itself, should be approved if it is fair, reasonable and adequate." *Hill v. State St. Corp., No. 09-12146,* 2014 U.S. Dist. LEXIS 179702, at \*27 (D. Mass. Nov. 26, 2014). A plan of allocation is fair and reasonable so long as it has a "reasonable, rational basis." *Id.* (quoting *In re IMAX Sec. Litig.*, 283 F.R.D. 178, 192 (S.D.N.Y. 2012)). "A reasonable plan of allocation need not necessarily treat all class members equally" and "may allocate funds based on the extent of class members' injuries and consider the relative strength and values of different categories of claims." *Id.* (internal citations and quotations omitted).

The proposed Plan of Allocation[11] meets this standard. The Plan of Allocation first divides the Net Settlement Fund into two Allocation Funds: the Consumer Fund and the Third-Party Payor Fund. 20.7 percent of the Net Settlement Fund is allocated to the Consumer Fund and 79.3 percent is allocated to the Third-Party Payor Fund. This allocation is based on expert analysis of the QVAR market and transaction-level data, which shows that a reasonable allocation of damages in this case would be 20.7% of damages to consumers and 79.3% of damages to Third-Party Payors ("TPPs") (such as health and welfare funds). Leffler Decl. ¶ 11.

The Plan of Allocation further (i) calculates each Eligible Claimant's *pro rata* share of their corresponding Allocation Fund based on the amounts they have respectively paid and/or reimbursed for prescriptions of QVAR and QVAR Redihaler purchased in the Class States

---

[11] The proposed Plan of Allocation is attached as Exhibit B to the Seaver Declaration.

during the Class Period; and (ii) allocates the Fund among Class Members *pro rata* based upon this calculation.  Seaver Decl. Ex. B at ¶¶ 1, 10, 14.  Thus, consumer Eligible Claimants will receive their *pro rata* shares of the Consumer Fund, and TPP Eligible Claimants will receive their *pro rata* shares of the Third-Party Payor Fund.

Splitting the Net Settlement Fund into consumer and TPP Allocation Funds recognizes the reality of the QVAR market and ensures that claims from TPPs will not exhaust the settlement funds at the expense of consumers, and vice versa.  This type of allocation has been approved by a number of courts in pharmaceutical cases like this one.  *See, e.g., In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005); *Nichols v. SmithKline Beecham Corp.*, No. CIV.A.00-6222, 2005 WL 950616 (E.D. Pa. April 22, 2005).

"A plan of allocation that reimburses class members based on the type and extent of their injuries is generally reasonable."  *In re Lucent Techs., Inc., Sec. Litig.*, 307 F Supp. 2d 633, 649 (D.N.J. 2004).  This is precisely what the proposed method of distribution contemplates here.  The Plan of Allocation is straightforward and not burdensome, essentially consisting of the same process utilized in scores of settlements of similar pharmaceutical antitrust cases.  *See, e.g., In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 531 (E.D.Mich. 2003) (approving *pro rata* allocation plan); *see also In re Relafen*, 231 F.R.D. 52; *Nichols v. Smithkline Beecham Corp.*, 2005 WL 950616.  The plan of allocation thus has a "reasonable, rational basis" and should be preliminarily approved.

### 5.    The proposed form and manner of notice are appropriate.

Rule 23(e)(1)(B) provides that "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the propos[ed settlement]."  Fed. R. Civ. P. 23(e)(1)(B).  The proposed forms of Notice and the proposed Notice Plan here fully comply with due process and Rule 23.

"The notice must describe fairly, accurately and neutrally the claims and parties in the litigation, the terms of the proposed settlement, and the options available to individuals entitled to participate, including the right to exclude themselves from the class." *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 203 (D. Me. 2003), *judgment entered,* No. MDL 1361, 2003 WL 21685581 (D. Me. July 18, 2003). The proposed Long-Form Notice ("Notice"), attached as Exhibit D to the Seaver Declaration, describes the classes, procedural status of the litigation, significant terms of the Settlement, including the amount of money the Teva has agreed to pay and Teva's agreement to request withdrawal of patents from the Orange Book, the releases Teva will receive, and the Plan of Allocation of the funds among the members of the End-Payor Class.[12]

The Notice also informs Class Members that Class Counsel will seek an award of attorneys' fees not to exceed 33% of the Settlement Fund, reimbursement of reasonable litigation costs, and service awards of $25,000 for each of the four EPP Plaintiffs, to be paid from the Settlement Fund. The Notice further outlines the court approval process and advises class members of their rights under Rule 23, including the right to object to, and be heard as to, the reasonableness and fairness of the Settlement, and the right to seek exclusion (i.e., opt out) of the Class. The Notice is substantially similar, in both form and substance, to notices used in other end payor generic delay cases and satisfies the notice requirements of Rule 23(e) and the due process requirements that must be met to bind each member of the class.

Rule 23(c)(2)(B) requires "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). The best notice practicable is notice that can be "reasonably

---

[12] The Short-Form Notice is attached as Exhibit E to the Seaver Declaration.

calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314-15 (1950). Notice may be provided by "United States mail, electronic means, or other appropriate means." Fed. R. Civ. P. 23(c)(2).

Consistent with due-process requirements, the Notice Plan contemplates notice to be provided through first-class mail, email, and digital media publication. *See* Pang Declaration re Notice and Claims Administration (attached as Seaver Decl. Ex. F). The Notice Plan is specifically tailored to both TPPs and consumers.

For TPPs, the Notice Plan provides direct mail notice to those TPPs whose addresses can be reasonably identified. TPPs are often claimants in similar pharmaceutical antitrust actions. Indeed, the proposed Claims Administrator, A.B. Data, maintains a proprietary database consisting of contact information for approximately 42,000 entities, including (i) insurance companies; (ii) health maintenance organizations; (iii) self-insured entities such as large corporations, labor unions, and employee benefit and pension plans; and (iv) certain record keepers and other entities that have relationships with or may represent TPPs, such as pharmacy benefit managers and third-party administrators. Pang Decl. ¶ 30. Should the Notice Plan be approved, the short-form notice will be formatted as a postcard and sent via first-class mail to A.B. Data's entire TPP database. *Id.* ¶ 32. A.B. Data will also send a notice in the form of an email, with substantially similar content as the postcard notice, to approximately 1,500 entities in its TPP database with available, valid email addresses. *Id.* ¶ 35. Direct mailed notice will also be supplemented with digital advertising targeted to websites used by TPPs. *Id.* ¶ 36.

For consumer Class Members, addresses are not reasonably available. Thus, A.B. Data has devised a comprehensive digital, print, and earned media campaign to reach consumers.

This will include banner ads employed on the Google Display Network, which places digital ads on websites, blogs, and other properties within its own network and over 2 million other websites across the Internet. *Id.* ¶ 18. At least 328 million gross impressions will be delivered across multiple devices, including desktop, tablet, and mobile. *Id.* Digital advertising will run across a variety of websites for 30 days to allow ample time to deliver the targeted impressions. Banner ads will also be displayed through popular social media platforms such as Facebook, Instagram, and YouTube. *Id.* ¶ 24.

The Claims Administrator will update the dedicated informational case website and maintain a case-specific toll-free telephone number to further ensure Class Members can easily access Settlement-related information. *Id.* ¶¶ 40-42. A.B. Data will also use keyword search sponsorships so that the Settlement website will appear upon searching for relevant words, such has "QVAR" or "Redihaler." *Id.* ¶ 26.

Finally, the Notice Plan will also employ print media and press releases to reach those Class Members who might use more traditional media sources. The short-form notice will be advertised in *People* magazine, which has an estimated circulation of 2,200,000. *Id.* ¶ 28. The short-form notice will also be disseminated using *PR Newswire*, which will reach traditional media outlets (television, radio, newspapers, magazines), news websites, and journalists nationwide. *Id.* ¶ 38.

The proposed Notice Plan will reach at least 80% or more of the target audience. *Id.* ¶ 52. Notice plans with such attributes have been routinely approved in pharmaceutical antitrust cases such as this. *See In re Remeron End-Payor Antitrust Litig.*, 2005 WL 2230314, at *15; *In re Effexor XR Antitrust Litig.,* No. 3:11-cv-05661, ECF No. 739 (D.N.J.); *In re Remicade Antitrust Litig.*, No. 17-CV-04326, 2023 WL 2530418 at *13 (E.D. Pa. Mar. 15, 2023); *In re Zetia*

*(Ezetimbe) Antitrust Litig.*, No. 2:18-MD-2836, 2022 WL 3337794 at *8-9 (E.D. Va. Feb. 9, 2022).  End-Payor Plaintiffs thus submit that their proposed manner of giving notice should be approved.

### 6.    The Court should appoint A.B. Data as settlement administrator.

A.B. Data is an experienced national class-action and settlement administrator and has been appointed to administer hundreds of class actions, including many pharmaceutical antitrust actions.  Pang Decl. ¶ 3.  As Claims Administrator, A.B. Data will have the authority to contact the claimants as necessary to confirm information provided in the Claim Forms or to seek additional information as required.   Under the supervision of Class Counsel, the Claims Administrator will ensure that Class Members' claims are handled appropriately, that HIPAA-protected data is maintained in a secure manner, that inquiries from Class Members are responded to in a timely fashion, and that claims are administered fairly and accurately.

### 7.    The Court should appoint Western Alliance Bank as Escrow Agent.

Plaintiffs also request that the Court approve Western Alliance Bank as Escrow Agent for the Settlement Fund, from which any taxes, court-awarded attorneys' fees, costs and expenses, and service awards will be deducted, with the remaining amount constituting the Net Settlement Fund for distribution to the End-Payor Class.  Western Alliance Bank is a well-capitalized bank that has significant experience holding and managing Qualified Settlement Funds ("QSFs").  Seaver Decl. ¶ 10.  With the Court's approval, the Escrow Agent will establish the escrow account as a QSF and will comply with all other requirements for the account identified in the Settlement Agreement.

### 8.    The proposed schedule is fair and should be approved.

End-Payor Plaintiffs propose the following schedule for completing the approval

process:[13]

| Event | Deadline for Compliance |
|---|---|
| Date for Fairness Hearing | 120 days after entry of the Preliminary Approval Order |
| Mailing of Notice | No later than 30 calendar days after entry of Preliminary Approval Order (the "Notice Date") |
| Commencement of Digital and Social Media Campaign | No later than 30 calendar days after entry of the Preliminary Approval Order |
| Filing deadline for objections | No later than 45 calendar days after the Notice Date |
| Filing deadline for requests for exclusion | No later than 45 calendar days after the Notice Date |
| Deadline for filing Claim Forms | No later than 120 calendar days after entry of the Preliminary Approval Order |
| Date for End-Payor Plaintiffs to file motion for final approval of the Settlement, the Plan of Allocation, and application for attorneys' fees and reimbursement of costs and expenses | 35 calendar days prior to the Fairness Hearing |
| Date for End-Payor Plaintiffs to file reply in further support of motion for final approval of the Settlement, the Plan of Allocation, and application for attorneys' fees and reimbursement of costs and expenses | 7 calendar days prior to the Fairness Hearing |

Any class member who timely objects to the settlement may be heard at the fairness hearing.

---

[13]  Pursuant to the Class Action Fairness Act of 2005 ("CAFA"), the defendants shall serve notices as required under CAFA within ten (10) days from the date the direct purchasers file for preliminary approval of the proposed settlement.

**B.      The End-Payor Class should be certified for settlement purposes.**

Having addressed the appropriateness of preliminary approval of the Settlement, End-Payor Plaintiffs now address the second part of the preliminary approval analysis, concerning whether the Court "will likely be able to ... certify the class." Fed. R. Civ. P. 23(e)(1)(B)(ii). Pursuant to Rule 23, preliminary certification, for settlement purposes only, is sought for the following Settlement Class:

> All persons or entities that, for consumption by themselves, their families, or their members, insureds, or beneficiaries, purchased, paid, and/or provided reimbursement for some or all of the purchase price of QVAR and/or QVAR Redihaler in the Class States,[14] other than for resale, at any time from January 1, 2015 through July 31, 2025 (the "Class Period").

The following persons or entities are excluded from the Settlement Class: (a) Teva and their respective subsidiaries and affiliates; and (b) federal and state governmental entities. Settlement Agr. ¶ 1. Teva does not object to certification of this Class for purposes of settlement.

As courts in this district have held, a class action is a "particularly appropriate" method to resolve and litigate claims of unlawful anticompetitive conduct. *In re Carbon Black Antitrust Litig*., No. 03-10191-DPW, 2005 WL 102966, at *9 (D. Mass. Jan. 18, 2005). Ultimately, the purpose of Rule 23 is to allow plaintiffs to combine resources, streamline the efficient prosecution of a litigation, and achieve a "more powerful litigation posture." *Hawaii v. Standard Oil Co*., 405 U.S. 251, 266 (1972). As with the numerous prior cases in which courts have certified a class of end-payor plaintiffs bringing claims based on the anticompetitive misconduct

---

[14]  The Class States are Alaska, Arkansas, Arizona, California, Connecticut, Delaware, D.C., Florida, Hawaii, Illinois, Indiana, Iowa, Kansas, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Utah, Virginia, Vermont, Washington, West Virginia, Wisconsin, and Wyoming. (Settlement Agr. ¶ 1 n.1.)

of drug manufacturers, the Court should certify the proposed Settlement Class in this case.

A plaintiff attempting to certify a class under Rule 23 must establish four discrete and well-established elements: (i) numerosity; (ii) commonality; (iii) typicality; and (iv) adequacy of representation. Once a plaintiff successfully establishes that these four elements are met, they next must establish one of the several elements of Rule 23(b). *Smilow v. Southwestern Bell Mobile Systems, Inc.*, 323 F.3d 32, 38 (1st Cir. 2003). In this Circuit, "Rule 23(a) should be liberally construed." *Lessard v. Metro. Life Ins. Co.*, 103 F.R.D. 608, 610 (D. Me. 1984). Furthermore, any doubt should be resolved in favor of certification. *In re Carbon Black Antitrust Litig.*, No. CIV.A.03-10191-DPW, 2005 WL 102966, at *9.

### 1. Class certification is appropriate under Rule 23(a).

#### a. Class members are so numerous that joinder is impractical.

Rule 23(a)(1) requires that members of a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Generally, "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met."[15] *García-Rubiera v. Calderón*, 570 F.3d 443, 460 (1st Cir. 2009). Here, thousands of third-party payors and consumers paid for QVAR prescriptions filled during the Class Period, satisfying the numerosity requirement. *See* Pang Decl. ¶ 30 (TPP Database contains approx. 42,000 entities).

---

[15] *See also In re Relafen Antitrust Litig.*, 218 F.R.D. 337, 342 (D. Mass. 2003) (holding that forty class members generally sufficient to establish numerosity) ("*Relafen I*"); *see also In re Loestrin 24 FE Antitrust Litig.*, 410 F. Supp. 3d 352, 397 (D.R.I. 2019) (numerosity satisfied "in light of the fact that there were approximately 24,534 employer-sponsored health plans in the United States in 2012") ("*Loestrin*"); *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 14-02503, 2017 WL 4621777, at *12 n.12 (D. Mass. Oct. 16, 2017) (certifying class where "millions of prescriptions are estimated to be involved .... establishing impracticability of joinder here") ("*Solodyn*").

**b.  The End-Payor Plaintiffs' claims present common issues of law and fact.**

Rule 23(a)(2) requires "questions of law or fact common to the class," which this circuit characterizes as a "low bar." *In re McKesson Governmental Entities Average Wholesale Price Litig.*, 767 F. Supp. 2d 263, 269 (D. Mass. 2011) ("*McKesson AWP*").  In assessing commonality, the court should inquire into "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation" that do not vary by class member. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  Common answers are generated from common "questions that go to the heart of the elements of a cause of action" and for which "determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Donovan v. Philip Morris USA, Inc.,* No. CIV.A. 06-12234-DJC, 2012 WL 957633, at *21 (D. Mass. Mar. 21, 2012).  A single common question will suffice for commonality. *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503, 2017 WL 4621777, at *12, n.12; *McKesson AWP*, 767 F. Supp. 2d at 269.

Here, the claims of the Settlement Class raise common questions of law and fact.  End-Payor Plaintiffs allege that Teva engaged in an anticompetitive scheme to prevent and delay the approval and marketing of generic QVAR inhalers, causing Class Members to pay inflated prices.  The singular scheme included alleged unlawful Orange Book listings and product hops. CAC ¶¶ 6-9, 244 *et seq*.  The End-Payor Plaintiffs' claims therefore involve common questions of fact, including whether Defendants' Orange Book listings and product hops were intended to frustrate generic competition, whether generic entry would have occurred but-for Teva's scheme, and whether EPP Plaintiffs were overcharged.  Common questions of law include whether Defendants' scheme violated state antitrust and/or consumer-protection laws and laws pertaining to unjust enrichment, whether any procompetitive justifications outweigh any anticompetitive

benefits, and whether Teva could assert a regulatory mandate defense. As such, the commonality requirement here is easily met.[16]

### c. The EPPs' claims are typical of those in the Class.

Rule 23(a)(3) is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A representative plaintiff's claims need not be identical to class members' claims to be typical. *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D. Mass. 2008) ("functional question [is] whether the putative class representative can fairly and adequately pursue [] interests of [] absent class members").[17] Rather, the plaintiff's claims must "arise from the same events or course of conduct as do the injuries that form the basis of the class claims…[and be] based on the same legal theory." *Kinney v. Metro Glob. Media, Inc.*, No. 99-cv-579, 2002 WL 31015604, at *4

---

[16] *See In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 67 (E.D. Pa. 2019), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020) (commonality met where "[r]esolution of each of these issues depends entirely on [defendant's] conduct and, thus, on evidence common to the class:" "whether defendant's anticompetitive scheme suppressed generic competition to Suboxone" and "whether Reckitt had the ability to control prices and exclude competition"), *aff'd*, 967 F.3d 264 (3d Cir. 2020); *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 335 F.R.D. 1, 13 (E.D.N.Y. 2020) (commonality requirement met because case was "replete with common evidence") ("*Restasis*"); *In re Loestrin*, 410 F. Supp. 3d at 397 ("EPPs easily establish that the anticompetitive conduct they allege involves numerous common questions of law and fact"); *Hosp. Auth. of Metro. Gov't of Nashville & Davidson Cty. v. Momenta Pharms., Inc*., 333 F.R.D. 390, 403-04, 409-12 (M.D. Tenn. 2019) (commonality met because Plaintiffs' claims are "based on Defendants' allegedly anticompetitive conduct and its effects on the generic enoxaparin marketplace"); *In re Solodyn*, 2017 WL 4621777, at *12, n.12 (commonality established where "EPPs' claims all stem from the same alleged anticompetitive conduct"); *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 315 F.R.D. at 122 (Plaintiffs' allegations that defendant "engaged in a common course of fraudulent conduct directed toward the entire class" satisfied commonality requirement).

[17] *See also In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 275 F.R.D. 382, 390 (D. Mass. 2011) ("class representatives' claims can be considered typical even where there is some factual variation among the claims of different class members").

(D.R.I. Aug. 22, 2002) (quoting *In re Bank of Boston Corp. Sec. Litig.*, 762 F. Supp. 1525, 1532

(D. Mass. 1991)).[18]  Typicality is satisfied when all claims arise from some overarching scheme

of the defendants,[19] "irrespective of varying fact patterns that may underlie individual claims."[20]

Antitrust cases are "particularly likely" to satisfy typicality because plaintiffs' claims will arise

out of the same unlawful conduct and be based on the same legal theory.[21]

     All EPP claims here arise from the same course of conduct, namely Defendants'

anticompetitive scheme delay generic competition for QVAR.  Defendants delayed competition

in a way that caused end payors to pay supracompetitive prices during the Class Period.

Although the claims arise under varying statutes, the End-Payor Plaintiffs' claims, and those

---

[18]  *See also Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC,* No. CIV.A. 04-5898, 2010 WL 3855552, at *7 (E.D. Pa. Sept. 30, 2010) (typicality met where end-payor plaintiffs proceeding under different theories of recovery and possessing different economic injuries, because defendant's "alleged conduct gives rise to all of their claims"); *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 250 (D. Del. 2002), *aff'd,* 391 F.3d 516 (3d Cir. 2004) (Typicality is found "where the claims of the class representatives and the class members arise from the same alleged course of conduct by the defendant.").

[19]  *See In re Carbon Black Antitrust Litig.,* No. CIV.A.03-10191-DPW, 2005 WL 102966, at *12 (finding typicality where overarching unlawful anticompetitive scheme); *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 260 (D.D.C. 2002) (finding typicality where "theory of an overarching conspiracy to fix prices and allocate the market in violation of antitrust laws will be common to all class members").

[20]  *Osgood v. Harrah's Ent., Inc.*, 202 F.R.D. 115, 125 (D.N.J. 2001*); see also In re Solodyn*, 2017 WL 4621777, at *12, n.12 (end-payor plaintiffs established typicality where the named plaintiffs' claims arose "from the same unlawful conduct by the Defendants as absent class members and they suffered the same injury in the form of overpayments"); *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183–84 (3d Cir. 2001), *as amended* (Oct. 16, 2001) (class representatives' claims were typical of class even though class members purchased different investments because they were based on same legal theory); *In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 241-42 (E.D.N.Y. 1998) ("If a central conspiracy is established, differences in the way in which the plan was manifested are unimportant.").

[21]  *Newberg on Class Actions* § 20:40 (5th ed. Dec. 2019 update).

of the Settlement Class, arise from the same common course of conduct. Proof by the EPPs of Defendants' anticompetitive scheme and consumer protection violations will be the same for themselves, individually, as for the rest of the Settlement Class. And the state law claims do not defeat typicality where, as here, the relevant state laws mirror federal law and each other in their essential elements. *See In re Loestrin*, 410 F. Supp. 3d at 398 (finding typicality satisfied where named plaintiffs' claims were typical of those in state law jurisdictions seeking certification).[22] Accordingly, the typicality requirement is satisfied.

### d. End-Payor Plaintiffs will adequately represent the Class.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class," a factor that "requires Plaintiffs to establish an absence of potential conflict and an assurance of vigorous prosecution." *Andrews v. Bechtel Power Corp*., 780 F.2d 124, 130 (1st Cir. 1985). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent," *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 625 (1997), based upon the "economic reality" of the representative parties and the class members. *In re Relafen Antitrust Litig*., 221 F.R.D. 260, 270 (D.Mass. 2004) ("*Relafen II*"). "[P]erfect symmetry of interest is not required." *Matamoros v. Starbucks Corp*., 699 F.3d 129, 138 (1st Cir. 2012).[23] Only conflicts that are "fundamental to the suit and that go to the heart of the litigation" are relevant. *Matamoros*, 699 F.3d at 138 (quoting *Newberg on Class Actions,* sec. 3:58 (5th ed. 2012)). "[S]peculative conflict should be disregarded." *Natchitoches*, 247 F.R.D. at

---

[22] *See also In re Flonase Antitrust Litig.*, 284 F.R.D 207, 217-18 (E.D. Pa. 2012) (end-payor's state law claims typical because "state law claims for monopolization, [unfair and deceptive trade practices], and unjust enrichment arise from an identical course of conduct" by defendant) ("*Flonase*").

[23] *See also In re Solodyn*, 2017 WL 4621777 at *12 (same).

265.

All EPPs have the same objective in proving that Defendants acted unlawfully where, as here, Defendants' scheme underlies all of EPPs' claims.[24]  As in numerous pharmaceutical generic delay cases that have come before this one, the "economic reality" here is that all end payors suffered identical injuries: overcharges for purchases of QVAR and QVAR Redihaler and/or their AB-rated generic equivalents.[25]  EPPs also share the objective to show through common proof that, had Defendants not wrongfully listed numerous patents in the Orange Book and employed unlawful product hops, Class Members would have purchased generic QVAR products sooner and at prices lower than the brand prices.  This would be proven using common data and standard economic methods for calculating overcharges.

### 2.    Rule 23(b)(3) is satisfied.

Under Rule 23(b)(3), a class action should be certified when the court finds that common

---

[24]  *See Momenta Pharms., Inc.*, 333 F.R.D. at 405 (holding named end-payor plaintiffs' "interests are aligned with the putative class members because they all possess the same interests and have suffered the same alleged injury i.e., they have each allegedly paid more for generic enoxaparin than they would have paid absent the alleged conspiracy"); *In re Carbon Black Antitrust Litig.*, 2005 WL 102966, at *14 (because overarching question is conduct of defendants, "named plaintiffs and their counsel have the same core objectives as would absent class members"); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 336 (E.D. Mich. 2001) (adequacy satisfied where "named representative and the absent class members similarly assert that they were injured by the same illegal conduct on the part of the defendants.").

[25]  *See In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, 2017 WL 4621777, at *12 (sufficient "alignment of incentives" to support adequacy where "all putative members seek to show that they were injured in the same way—overcharges—through the same illegal conduct by Defendants."); *In re Nexium (Esomeprazole) Antitrust Litig., 297 F.R.D. 1*68, 172 (D. Mass. 2013), aff'd sub nom. *In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015) (adequacy "supported by the fact that all payors in the putative class allegedly paid supracompetitive prices for a single product… and suffered identical economic injuries") ("*Nexium I*"); *In re Flonase Antitrust Litig.*, 284 F.R.D. at 218 (no conflicts where "[e]ach class member purchased and/or reimbursed for [Flonase] at some point during the Class Period at a supracompetitive price" and thus "holds a strong common interest" in establishing defendant's liability).

questions of law or fact predominate over individual issues and a class action would be superior to other methods of resolving the controversy.  Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc.*, 521 U.S. at 623.  When common questions are a significant aspect of a case and can be resolved in a single action, class certification is appropriate.  *See* 7A Wright, Miller & Kane, *Federal Practice and Procedure: Civil 2d*, § 1788 at 528 (3d ed. 1986).  Superiority "asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of alternative available methods of adjudication."  *In re Nat'l Football League Players Concussion Injury Litig.*, *In re Nat'l Football League Players Concussion Inj. Litig.*, 821 F.3d 410, 434 (3d Cir. 2016), *as amended* (May 2, 2016), 434 (3d Cir. 2016).  Here, the Settlement Class readily meets both the predominance and superiority requirements.

First, common questions exist that go to the core of Defendants' scheme and Class Member injury. If each Class Member were to bring an individual action, each would need to demonstrate the same scheme to prove liability.  Because the evidence needed to prove such claims would be the same for all, a finding of predominance is appropriate.  *Amgen*, 568 U.S. at 466-67; *see also Amchem*, 521 U.S. at 625 ("[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws").  These claims thus present common operative facts and common questions of law that predominate over any factual variations.  *See In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 555 (S.D.N.Y. 2021) ("Any evidence regarding the pay-for-delay scheme will focus solely on Defendants' conduct and will not vary across class members…. Thus, common questions of law and fact predominate….").

Second, certification of the Settlement Class under Rule 23 is "superior to other available

methods for fairly and efficiently adjudicating the controversy."  Fed. R Civ. P. 23(b)(3).  The settlement affords benefits to a large number of putative Settlement Class Members who, absent a class settlement, may not have been aware of their legal rights or may not have had the desire or resources to pursue an individual suit involving the matters at issue.  *See In re Warfarin Sodium Antitrust Litig.*, 391 F.3d at 534 (finding superiority requirement satisfied in antitrust class action where there were a "potentially large number of class members [ ], including some 2 million consumers and potentially thousands of TPPs" and reasoning in part that "individual consumer class members have little interest in individually controlling the prosecution or defense of separate actions because each consumer has a very small claim in relation to the cost of prosecuting a lawsuit"). [26]  "Moreover, '[i]ndividual treatment of each class members' claims would require duplicative, expensive litigation,  which  would  come  at  enormous  expense  to  the  parties and  judicial economy.  Class resolution would also avoid problems of inconsistent resolution." *In re Remicade Antitrust Litig.*, No. 17-CV-04326, 2022 WL 3042766, at *8 (E.D. Pa. Aug. 2, 2022) (citation omitted).  Thus, resolving the Settlement Class Members' claims in a single, consolidated settlement proceeding is far superior to individual adjudication of their claims. And, as this is a class settlement, the court need not address manageability issues that may otherwise exist in a contested class action.[27]

### 3.      The Class is ascertainable.

Courts have found that Rule 23(b)(3) has an implied "ascertainability" requirement– that the class members must be identifiable by objective criteria and in an administratively feasible

---

[26] *See also In re Comcast Corp. Set-Top Cable Television Box Antitrust Litig.*, 333 F.R.D. at 378 (finding superiority requirement met in antitrust class action for similar reasons, *i.e.*, that there were millions of class members with low-dollar-value claims).

[27] *See Amchem*, 521 U.S. at 620.

manner.  *See Nexium I*, 777 F.3d at19-20; *Matamoros*, 699 F.3d at 139 (class was not

"unascertainable and overbroad" where defined in terms of "objective criterion"); *In re Solodyn,*

*(Minocycline Hydrochloride) Antitrust Litig.*, No. CV 14-MD-02503, 2017 WL 4621777, at *13-

14 (end-payor class ascertainable).  Not every class member must be identified, but the class

must be sufficiently ascertainable to permit a court to "decide and declare who will receive

notice, who will share in any recovery, and who will be bound by the judgment." *Karth v. Keryx*

*Biopharmaceuticals, Inc.*, 334 F.R.D. 7, 14–15 (D. Mass. 2019), *aff'd,* 6 F.4th 123 (1st Cir. 2021)

(*citing Crosby v. Soc. Sec. Admin. of the U.S.*, 796 F.2d 576, 580 (1st Cir. 1986)).

Ascertainability does not, however, require plaintiff to identify all class members at class

certification; rather, "plaintiff need only show that 'class members can be identified.'" *In re*

*Thalomid & Revlimid Antitrust Litig*, No. CV 14-6997, 2018 WL 6573118, at *18.[28]

        EPPs satisfy this requirement.  Pharmaceutical transactions are some of the most detailed

of any industry, recording almost every aspect of the purchase in uniform data outputs.  By

referencing readily available, detailed data sources used in the data-rich pharmaceutical

industry,[29] EPPs can identify class members by reference to the objective criteria in the class

---

[28]  *See also In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 71 (E.D. Pa. 2019), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020) (ascertainability inquiry is "narrow" and defendants challenging "must be exacting in their analysis and not infuse the ascertainability inquiry with other class-certification requirements.") ("*Suboxone*").

[29]  *See, e.g., In re Solodyn (Minocycline Hydrochloride) Antitrust Litigation*, 2017 WL 4621777, at *13-14 (District of Massachusetts recognizes it is administratively feasible to ascertain end-payor class membership in the pharmaceutical industry given that data are collected and maintained at every transaction level); *see also In re Suboxone (Buprenorphine Hydrochloride and Nalaxone) Antitrust Litigation*, 421 F. Supp. 3d at 72 ("The proposed method for identifying class members must be 'administratively feasible,' meaning that 'identifying class members is a manageable process that does not require much, if any individual factual inquiry.'").

definition: purchase, payment, and/or provision of reimbursement for some or all of the purchase price of QVAR and/or QVAR Redihaler in the Class States, other than for resale, during the Class Period.

End-Payor Plaintiffs have submitted proposed claim forms for the Net Settlement Fund. *See* Seaver Decl. Exs. G, H (attaching claim forms).  The claims administrator will determine if a claimant is a Class Member; otherwise, they are not entitled to a recovery.  Pang Decl. ¶¶ 45-51. To do so, TPPs and consumers can be required to submit proof that they paid for all or part of the purchase price of brand or generic QVAR at some point during the Class Period.  *Id.* ¶¶ 47-48.  If they did, they are in the class—so long as they do not fit one of the objective class exclusions. *Id.* ¶¶ 49-51.  The claim forms are designed to help the Claims Administrator determine eligibility.  *Id.* ¶¶ 47-48.  And if a claimant is unable to prove class membership or is excluded from the class, their claim is rejected.  *Id.* ¶¶ 49-51.  A strong indicator of the reliability and feasibility of this methodology is the fact that the exercise is performed routinely in the settlement context.

Accordingly, the End-Payor Class should be certified for settlement purposes.

### 4.    Proposed Class Counsel satisfy Rule 23(g).

Pursuant to Rule 23(g), Plaintiffs also move to appoint Berman Tabacco, Sperling Kenny Nachwalter, LLC, and Hilliard Shadowen LLP as Class Counsel.  Rule 23(g) focuses on the qualifications of class counsel, complementing the requirement of Rule 23(a)(4) that the representative parties adequately represent the interests of the class members.  Although a court may consider any factor concerning the proposed class counsel's ability to "fairly and adequately represent the interests of the class," Rule 23(g)(1)(A) specifically instructs a court to consider:

> (i)    the work counsel has done in identifying or investigating potential claims in the action;
> (ii)    counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

      (iii)    counsel's knowledge of the applicable law; and

      (iv)    the resources that counsel will commit to representing the class.

Here, each of these considerations weighs strongly in favor of the adequacy of proposed Class Counsel. Class Counsel performed substantial work identifying and investigating potential claims and properly supporting the allegations in the complaints, as shown by the fact that this Court ultimately denied, in large part, Defendants' motions to dismiss and for judgment on the pleadings. The initial complaint in this action was the result of a nearly year-long investigation, including carefully reviewing patents, academic literature, company filings, and legal authority. Seaver Decl. ¶ 3.

As reflected in their firm resumes, proposed Class Counsel have substantial experience, individually and collectively, successfully prosecuting class actions and other complex litigation throughout the United States, including antitrust actions. *See* Seaver Decl. Exs. I-K (firm resumes). Moreover, the firms have demonstrated their abilities and commitment to this litigation, devoting the resources and personnel necessary to get to this point—achieving a substantial settlement approximately two and a half years after the litigation began. Proposed Class Counsel meet the requirements of Rule 23(g).

## IV.    CONCLUSION

For all the foregoing reasons, End-Payor Plaintiffs respectfully request that the Court certify the Settlement Class, preliminarily approve the proposed Settlement with Teva, direct notice to be disseminated to the Class, and grant the additional relief outlined herein.

DATED: October 24, 2025

**BERMAN TABACCO**

By: */s/ Matthew D. Pearson*
Kathleen M. Donovan-Maher (BBO #558947)
Leslie R. Stern (BBO #631201)
Christina Fitzgerald (BBO #709220)
One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
kdonovanmaher@bermantabacco.com
lstern@bermantabacco.com
cfitzgerald@bermantabacco.com

Joseph J. Tabacco, Jr. (BBO #491260)
Nicole Lavallee (*pro hac* forthcoming)
Todd A. Seaver (BBO #645874)
Matthew D. Pearson (admitted *pro hac*)
Carl Hammarskjold (admitted *pro hac*)
**BERMAN TABACCO**
425 California St, Suite 2300
San Francisco, CA 94104
Telephone: (415) 433-3200
Facsimile: (415) 433-6382
jtabacco@bermantabacco.com
nlavallee@bermantabacco.com
tseaver@bermandetabacco.com
mpearson@bermantabacco.com
chammarskjold@bermantabacco.com

Joseph M. Vanek (BBO # 551083)
Eamon Kelly (*pro hac* forthcoming)
Martin V. Sinclair, Jr. (*pro hac* forthcoming)
David Lesht (*pro hac* forthcoming)
**SPERLING KENNY NACHWALTER, LLC**
321 N. Clark St
Suite 2500
Chicago, IL 60654
Telephone: (312) 641-3200
jvanek@sperlingkenny.com
ekelly@sperlingkenny.com
msinclair@sperlingkenny.com
dlesht@sperlingkenny.com

Steve D. Shadowen (admitted *pro hac*)
Nicholas Shadowen (admitted *pro hac*)

Matthew C. Weiner (admitted *pro hac*)
Tina J. Miranda (*pro hac* forthcoming)
**HILLIARD SHADOWEN LLP**
1135 W. 6th Street, Suite 125
Austin, TX 78703
Telephone: (855) 344-3298
steve@hilliardshadowenlaw.com
nshadowen@hilliardshadowenlaw.com
matt@hilliardshadowenlaw.com
tmiranda@hilliardshadowenlaw.com

*Counsel for the End-Payor Plaintiffs and Proposed
Class Counsel*

Brian P. Murray (*pro hac* forthcoming)
Lee Albert (admitted *pro hac*)
Brian D. Brooks (admitted *pro hac*)
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: (212) 682-5340
bmurray@glancylaw.com
lalbert@glancylaw.com
bbrooks@glancylaw.com

*Counsel for Jacksonville  Police Officers and Fire
Fighters Health Insurance Trust*

Christopher M. Burke (admitted *pro hac*)
Yifan (Kate) Lv (admitted *pro hac*)
**BURKE LLP**
402 West Broadway, Suite 1890
San Diego, CA 92101
Telephone: (619) 369-8244
cburke@burke.law
klv@burkel.law

Allan Steyer (*pro hac* forthcoming)
**STEYER LOWENTHAL BOODROKAS
ALVAREZ & SMITH LLP**
235 Pine Street, 15th Floor
San Francisco, CA 94104
Telephone: (415) 421-3400
asteyer@steyerlaw.com

Marco Cercone (*pro hac* forthcoming)
**RUPP PFALGRAF LLC**
111 West 2nd Street, #1100
Jamestown, NY 14701
Telephone: (716) 664-2967
cercone@ruppfalz.com

*Counsel for New York State Teamsters Council
Health & Hospital Fund*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 24, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will send notification of such filing to all CM/ECF participants.

*/s/ Matthew D. Pearson*
Matthew D. Pearson